UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. _____

In Re:  Request from Colombia
Pursuant to the United Nations
Convention Against Illicit Traffic
in Narcotic Drugs and Psychotropic
Substances in the Matter of
Llanos Oil Exploration, Ltd., et al

_____/

**05-22060**

**CIV-MORENO**

## MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR ORDER

The United States is seeking an Order appointing a Commissioner to obtain evidence

requested by Colombia, pursuant to the United Nations Convention Against Illicit Traffic in Narcotic

Drugs and Psychotropic Substances (1988) [hereinafter referred to as "the Convention"].  Parties to

the Vienna Convention are bound by its obligations.  U.S. v. Vacant Land Known as Los Morros,

885 F. Supp. 1329, 1331 (S.D. Cal. 1995).  The Vienna Convention is a multilateral convention that

is classified as a treaty by the Department of State.  See U.S. Department of States, Treaties in Force,

(Dept. of State Pub. 9430) at 279 (1988).  To the extent that the provisions of a treaty are

inconsistent with a preexisting statutory provision, the treaty supersedes the statute.  United States

v. Erato, 2 F.3d 11, 15-16 (2d Cir. 1993).

The United States and Colombia entered into the Convention for the purpose of promoting

mutual legal cooperation in criminal matters.  The Convention obliges each state to provide

assistance to the other investigations of offenses covered under the Convention in court proceedings

relating to such offenses. The nature of that of assistance covered includes interviews and deposition

of witnesses, production of documents, and confiscation of property related to drug trafficking

crimes.  Los Morros, 885 F. Supp. at 1331.

The Convention empowers federal district courts to execute Colombian requests in order to comply with the United States' treaty obligation.  Article 7(1) provides that:

> The Parties shall afford one another, pursuant to this article, the widest measure of mutual legal assistance in investigations, prosecutions, and judicial proceedings....

The Vienna Convention is self-executing and requires no implementing legislation.  <u>Republic of Paraguay v. Allen</u>, 949 F. Supp. 1269, 1274 (E.D. Va. 1996), <u>aff'd</u>, 134 F.3d 622 (4th Cir.), <u>cert. denied</u>, 523 U.S. 371 (1998).  Even so, it contains little in the way of a procedural framework for executing requests.  Instead, it relies on the law of each state to establish procedures for executing requests in that state.  Article 7(3) provides that the requested Party will execute requests "allowed by the domestic law of the requested party."  Consequently, federal district courts routinely utilize the "commission" procedure authorized by 28 U.S.C. §1782, the statute governing the provision of assistance for foreign judicial proceedings generally, to fulfill their judicial responsibility under the Convention of executing Colombian requests.

1.    Appointment of a commissioner

Section 1782 provides in pertinent part that:

> The district court . . . may direct that the testimony or statement [of a person who resides or is found within the district] be given or the document or other thing be produced, before a person appointed by the court.

A federal district court customarily appoints or "commissions" a person or "commissioner" to collect evidence on behalf of the court and authorizes the commissioner to submit the evidence collected to the requesting foreign court or authority.  With requests for assistance in criminal matters, a court typically appoints an Assistant United States Attorney as commissioner.  However,

2

a court also may commission a foreign authority together with (or in lieu of) an Assistant United States Attorney.  See, e.g., In re Letter of Request from the Supreme Court of Hong Kong, 138 F.R.D. 27, 29 (S.D.N.Y. 1991).

Application to a federal district court for appointment of a commissioner to execute a foreign request for judicial assistance is handled ex parte.  In re Letter of Request from the Crown Prosecution Service of the United Kingdom, 870 F.2d 686, 688 (D.C. Cir. 1989); In re Letters Rogatory from the Tokyo District, Tokyo, Japan, 539 F.2d 1216, 1219 (9th Cir. 1976).

2.    Establishment of an evidence-collecting procedure

Section 1782 further provides in pertinent part that:

> To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

A federal district court empowers a commissioner to collect the evidence using the procedure prescribed by the court.  A court has "complete discretion in prescribing the procedure to be followed." Sen. Rep. No. 1580, 88th Cong., 2d Sess. 1 (1964), reprinted in 1964 U.S. Code Cong. & Admin. News 3782, 3789.  When a court's order fails to specify a procedure by which a commissioner is to collect the evidence, the Federal Rules of Civil Procedure apply. Japan II, 16 F.3d at 1019; Hong Kong, 138 F.R.D. at 32. However, as Section 1782 makes clear, when a court does specify a procedure other than one in accordance with the Federal Rules of Civil Procedure, the alternative procedure shall apply.  In re Letter of Request from the Government of France, 139 F.R.D. 588, 590-91 (S.D.N.Y. 1991).

In executing Colombian requests, the Convention obligates the courts to execute the request "....consistent with their domestic law or practice." See Article 7(4). In other words, the Convention requires that courts order the use of procedures comparable to those applicable in domestic investigations and prosecutions of criminal matters rather than, by default, the Federal Rules of Civil Procedure.

    a.    Commissioner's Subpoena

If a federal district court so orders, a commissioner may use the attached form, entitled commissioner's subpoena, to obtain the requested evidence. See, Erato, 2 F.3d at 13 (incorporating in pertinent part the district court's order directing the use of commissioner's subpoenas). The commissioner's subpoena is not a creation of the Federal Rules of Criminal Procedure nor the Federal Rules of Civil Procedure, but is an order of the court for the production of evidence in accordance with Section 1782. See 28 U.S.C. 1651. Upon authorization by a court, a commissioner may issue such commissioner's subpoenas as are necessary to execute the request in the relevant district.

    b.    Notice of evidence taking

The instant Convention Request has been made by the Fiscal General de Colombia [the Ministry of Justice and the Law], the Central Authority for Colombia, in connection with a current criminal investigation by the Third Delegated Prosecutor to Criminal Judges, Bogota, Colombia. The Third Delegated Prosecutor is investigating an alleged money laundering of narcotics' proceeds committed by a group of Colombian citizens. The Colombian investigation identified several companies which are the beneficiaries of these money transfers, including Llanos Oil Exploration and Intertextil Intertuna.

According to the request, Luis Onofre Redondo Niño is being investigated for falsehood, fraud in communications and money laundering.  Redondo Niño has allegedly participated in activities involving the fraudulent use of telecommunication devices and has incorporated a business, GlobalNet USA Corp., in Miami, Florida, to pay the expenses of the companies that he owns in Colombia.

Colombian authorities have filed as evidence bank records relating to the account held by GlobalNet at Banco Popular, which reveal that between 2000 and 2001, the account carried a balance of approximately $746,000,000 (Colombian pesos) derived from the purchase and sale of foreign currency.

In furtherance of their investigation, Colombian authorities request corporate information on GlobalNet USA and interviews of its employees.

Accordingly, to execute this request, the government moves this Court to issue the attached Order appointing Assistant United States Attorney Eric E. Morales as Commissioner, authorizing him to take the actions necessary, including the issuance of Commissioner's subpoenas, to obtain the evidence requested, and to adopt such procedures in receipt of the evidence as are consistent with the intended use thereof in Colombia.

Respectfully submitted,

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

By:

ERIC E. MORALES
ASSISTANT UNITED STATES ATTORNEY
Court No. A5500886
99 NE 4th Street, Fourth Floor
Miami, FL 33132-2111
Tel.    (305) 961-9255
FAX    (305) 530-7976
E-Mail: Eric.Morales@usdoj.gov

5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

COMMISSIONER'S SUBPOENA

TO:    _____

   _____

   _____

I, Commissioner Eric E. Morales, an Assistant United States Attorney for the Southern District of Florida, acting under the authority of the United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, and under Title 28, United States Code, Section 1782, for the purpose of rendering assistance to Colombia, command that you appear before me in Room 600, in the James Lawrence King, Federal Justice building located at 99 NE 4th Street, Miami, Florida on _____, 2005, at \_\_\_ a.m./p.m., to provide testimony/documents regarding an alleged violation of the laws of Colombia, namely, fraud and money laundering, among other alleged violations, and that at the time and place aforesaid you provide the following:

For failure to attend and provide testimony/said documents, you may be deemed guilty of contempt and liable to penalties under the law.

Dated:

COMMISSIONER ERIC E. MORALES
Assistant United States Attorney
Southern District of Florida
Telephone (305) 961-9255



**FISCALIA**
GENERAL DE LA NACION

OFFICIAL TRANSLATION Number....Ω..Ω..Ω...Ω....of a document written in SPANISH, to which for identification purposes the seal of the Office of International Affairs, Office of the Attorney General is affixed.

Letters rogatory 272
International legal assistance request

The undersigned, Prosecutor 8 delegated to Criminal Courts in and for the Circuit of Bogotá, D.C., Republic of Colombia, assigned to the National Unit of Extinction of Domain and Money Laundering, Attorney General's office, Bogotá, Colombia,

DOES HEREBY PRAY

The judicial authority of his same category in Miami, United States of America, to kindly collect the following evidence as ordered by resolution dated April 26, 2004 released within investigation 2085 L.A.

To transmit letters rogatory to Miami, United States to verify and send this office:

1. Certificate issued by the Chamber of Commerce or similar office with regards to GLOBAL NET USA CORP, main place of business 39970 West Flagler St., suite 2003, Miami, Florida 33134.
2. Whether the firm fulfills its corporate purpose according to Certificate issued by the Chamber of Commerce or similar office.
3. To verify the commercial activity of said firm
4. To inspect the main corporate address and verify:
    a. Operational and administrative infrastructure (staff, premises, payment roll, etc.)
    b. who is the firm's legal representative?
    c. Whether the company fulfills its corporate purposes
    d. Whether the company has branches or agencies; if positive where (cities or countries).
    e. To find out – through documents – whether LUIS ONOFRE REDONDO NIÑO, holder of Colombian identity card number 79.264.573 is partner and/or legal representative of GLOBAL NET  USA CORP, main place of business 39970 West Flagler St., suite 2003, Miami, Florida 33134.

5. To depose the employees or staff of GLOBAL NET USA CORPORATION to find out for how long have they been acquainted with LUIS ONOFRE REDONDO, for how long has he been partner and/or legal representative of the firm; how frequently does he visit the company; which is the firm's corporate purpose and any other related information.

- The subjects to be deposed must be advised of the following articles of our criminal and procedural codes:

ARTICLE 266: COMPEL / OBLIGATION TO RENDER STATEMENT. Every subject is compelled to render sworn statement in any proceeding he is summoned unless the constitutional and legal exceptions provided by Law. The minor witness ( less than 12) will not be sworn and will be assisted , if possible, by his/her legal representative or a relative of legal age who will be sworn about the secrecy of the proceedings.

ARTICLE 267. EXCEPTION TO RENDER STATEMENT. No one shall be compelled to depose against himself or his /her spouse, permanent companion or relatives by blood or marriage within fourth degree of blood kinship, second or first civil.

ARTICLE 442. FALSE TESTIMONY. Whoever at judicial or administrative proceedings, under oath or before a competent authority fails to tell the truth or omits it, totally or partially, shall be imprisoned from four (4) to eight (8) years.

6. To ask the judicial police or law enforcement agency - once collected the financial information on LUIS ONOFRE REDONDO and his firm GLOBALNET USA CORP- to make a financial review in order to establish whether the company counts on the financial capacity to send high amounts of money to Colombia.

FACTS

The present investigation is based on a claim filed by Ms. MARÍA DEL PILAR PULIDO ALVAREZ dated May 29, 2003, at the "Grupo contra el lavado de activos" (Assets Laundering Task Force) of "Cuerpo Técnico de Investigación" (Investigative Technical corps C.T.I) stating the irregular behavior of LUIS ONOFRE REDONDO NIÑO, holder of Colombian identity card number 79.264.573, who is charged with the commission of the presumptive crimes of FALSEHOOD, FRAUD IN COMMUNICATIONS AND MONEY LAUNDERING. The individual mentioned uses the employees of GLOBAL PHONE CARD to copy/imitate signatures in documents. He owns telecommunications devices called CLINTON which turn international phone calls into local /domestic phone calls in order to pay a lesser price and defraud the state. Also he incorporated GLOBAL NET USA CORP in Miami, United States and through BANCO POPULAR sends money to Colombia to pay the expenses of the companies he owns in Colombia. At present, this office has not background information of the company in the U.S.A.

According to withholdings certificate filed in these proceedings, the Banco Popular's account in behalf of GLOBALNET LTDA. shows around $746.000.000,00 for the sale and purchase of foreign currency between 2000 and 2001

## IMPORTANCE OF EVIDENCE REQUESTED

To establish the behavior of the subjects involved in the investigation, as well as others who might have been involved in the crime. This is a crime which trespasses the country's boundaries and becomes a transnational crime. It is necessary to strengthen international cooperation to fight criminal organizations.

The evidence is important taking into account that LUIS ONOFRE REDONDO NIÑO incorporated GLOBAL NET USA CORP., main place of business 39970 West Flagler St., suite 2003, Miami, Florida 33134. According to withholdings certificate filed in these proceedings, the Banco Popular's account in behalf of GLOBALNET LTDA. shows around $746.000.000,00 for the sale and purchase of foreign currency between 2000 and 2001

## FOUNDATIONS OF LAW

Money Laundering is provided for by article 323: whoever acquires, stores, invests, transforms, guards or administers estates/ properties,  directly or indirectly derived from extortion, illicit enrichment, extortive kidnapping, rebellion or drug trafficking and connected offenses or gives such property a legitimate appearance, conceals or hides the true nature, source, location, destination, movement or right over such property or carries out any other act to conceal or hide the illicit origin of the same, shall incur in prison from six ( 6) to fifteen (15) years and fine from five hundred ( 500) to fifty thousand ( 50.0000) monthly legal minimal wages.

Once taken the corresponding steps according to you national law, please return the evidence through diplomatic channels.

This is the opportunity to offer reciprocity for similar cases pursuant to laws and international treaties and customs in force and avails this opportunity to express the assurances of his highest consideration.

According to article 250 of the Colombian Constitution and article 114 of the Criminal Procedure Code, the Attorney General's office is in charge of investigating crimes and charges the presumptive malefactors before courts and competent tribunals.

The undersigned, Delegate Prosecutor assigned to the National Unit of Extinction of Domain and Money Laundering, Bogotá, D.C., April 28004.

Signed: LUZ STELLA GIRALDO CARDONA

Delegate Prosecutor

Authentication proceedings
Signed by MARÍA CRISTINA CHIROLLA LOSADA
Chief Prosecutor
--
CERTIFIED TO BE A TRUE AND COMPLETE TRANSLATION
Translator: Suzette Barboza Barboza
Bogotá, D.C., May 6, 2004





**FISCALIA**
GENERAL DE LA NACIÓN

# CARTA ROGATORIA NÚMERO 272

## SOLICITUD DE ASISTENCIA JUDICIAL INTERNACIONAL

**LA SUSCRITA FISCAL ESPECIAL OCTAVA DELEGADA ANTE LOS JUECES PENALES DEL CIRCUITO DE BOGOTA D.C. REPUBLICA DE COLOMBIA, ADSCRITA A LA UNIDAD NACIONAL PARA LA EXTINCIÓN DEL DERECHO DE DOMINIO Y CONTRA EL LAVADO DE ACTIVOS DE LA FISCALIA GENERAL DE LA NACION. BOGOTA-COLOMBIA.**

# SOLICITA:

**A LA AUTORIDAD JUDICIAL DEL MISMO RANGO DE MIAMI – ESTADOS UNIDOS, SE SIRVA PRACTICAR LAS SIGUIENTES PRUEBAS, A FIN DE DAR CUMPLIMIENTO A LO ORDENADO EN LA INVESTIGACION RADICADA BAJO EL NÚMERO <u>2085</u> L.A., MEDIANTE RESOLUCION DEL VEINTISEIS (26) DE ABRIL DE DOS MIL CUATRO (2004)**

Librar **Carta Rogatoria** a la Ciudad de Miami. Estados Unidos, con el fin de verificar y allegar;

**1.**- El certificado de Cámara y Comercio o su equivalente en dicho país, de la empresa **GLOBAL NET USA CORP**, con domicilio principal **39970 W EST FLAGLER ST.OFICINA 2003, MIAMI, FLORIDA 33134.**

**2.**- Si dicha empresa cumple el objeto Social de acuerdo al Certificado de Cámara y Comercio o entidad que haga sus veces.

**3.**- Verificar la actividad comercial desarrollada por la anterior empresa.

**4.**- Practicar Inspección Judicial a la dirección principal en donde funciona la empresa **GLOBAL NET USA CORP**, con el fin de verificar:

**a.**- Infraestructura operativa, administrativa (planta de personal y fisica, nómina etc.)
**b.**- Quién es el Representante Legal
**c.**- Si cumple su objeto social
**d.**- Si tiene sucursales, en caso afirmativo informar en qué paises o ciudades.

**e.-** Establecer a través de prueba documental si el señor **LUIS ONOFRE REDONDO NIÑO**, identificado con la Cédula de ciudadanía No. 79.264.573, ostenta la calidad de socio y/o Representante legal la empresa **GLOBAL NET USA CORP, ubicada en la 39970 W EST FLAGLER ST.OFICINA 2003, MIAMI, FLORIDA 33134**

**5.-** Se escuchará en declaración a aquellas personas o empleados de la **GLOBALNET USA CORP**, con el fin de establecer, cuánto hace que conocen al señor LUIS ONOFRE REDONDO, desde hace cuánto tiempo es el socio o dueño de la empresa, con qué frecuencia va a la empresa, cuál es el objeto social de la misma y demás datos que tengan relación con el giro ordinario de esa empresa.

* Las personas que van a rendir declaración se le deben poner de presente los artículos de Nuestro Ordenamiento Penal y Procesal Penal los cuales transcribo a continuación.

**ARTICULO 266 - Deber de rendir testimonio** – " Toda persona está en la obligación de rendir bajo juramento, el testimonio que se le solicita en la actuación procesal, salvo las excepciones constitucionales y legales. Al testigo menor de doce (12) años no se le recibirá juramento y en la diligencia deberá estar asistido, en lo posible, por su representante legal o por un pariente mayor de edad a quien se le tomará juramento acerca de la reserva de la diligencia".

**ARTICULO 267 – Excepción al deber de declarar** - "Nadie podrá ser obligado a declarar contra si mismo o contra su cónyuge, compañera o compañero permanente o parientes dentro del cuarto grado de consanguinidad, segundo de afinidad o primero civil".

**ARTICULO 442 – Falso Testimonio** – " El que en actuación judicial o administrativa, bajo la gravedad de juramento ante autoridad competente, falte a la verdad o la calle total o parcialmente, incurrirá en prisión de cuatro (4) a ocho (8) años".

**6.-** Solicitar a la Policia Judicial o al organismo que haga sus veces, que una vez obtenida toda la información patrimonial del señor LUIS ONOFRE REDONDO y de su empresa GLOBALNET USA CORP, realicen un estudio financiero con el fin de establecer si dicha compañia tiene la capacidad económica para enviar altas sumas de dinero a Colombia.

## HECHOS :

La presente investigación se origina con base en denuncia presentada por la señora MARIA DEL PILAR PULIDO ALVAREZ el 29 de mayo de 2003 en la oficina del Grupo Contra el Lavado de Activos del Cuerpo Técnico de Investigación C.T.I., quien coloca en conocimiento de las autoridades actuaciones irregulares efectuadas por el señor **LUIS ONOFRE REDONDO NIÑO**, identificado con la Cédula de Ciudadanía número 79.264.573, a quien sindica de cometer los presuntos delitos de FALSEDAD, FRAUDE EN COMUNICACIONES y LAVADO DE ACTIVOS, toda vez que el mencionado señor al parecer utiliza a los empleados de su empresa GLOBAL PHONE CARD para que imiten la firma de personas en documentos, tiene unos Equipos de Telecomunicaciones llamados CLINTON para que conviertan llamadas internacionas en

nacionales, pagar menor precio y asi defraudar al Estado; y habría conformado en la ciudad de Miami – Estados Unidos una sociedad o empresa llamada **GLOBALNET USA CORP**, a través de la cual, por intermedio del Banco Popular envia todo el dinero para pagar en Colombia los gastos que le generan las empresas constituidas en nuestro pais.  En la actualidad, se desconoce todo lo referente a esa empresa conformada en Estados Unidos.

De acuerdo a los certificados de retención en la fuente que obran en las diligencias, la cuenta del Banco Popular a nombre de GLOBALNET LTDA entre los años 2000 y 2001 registra un rubro aproximado de **$746.000.000**.oo por compra y venta de divisas.

## IMPORTANCIA DE LA PRUEBA

Se trata de establecer la conducta desplegada por las personas que se encuentran implicadas en la investigación; así como las personas que hayan podido tener participación en el delito investigado, ya que el mismo traspasa las fronteras de nuestra nación y se convierte en uno de los denominados Delitos Transnacionales, esto en desarrollo del blanqueo y/o Lavado de Dinero, buscando así, hacer efectiva la cooperación internacional para la lucha contra las organizaciones criminales que están afectando a las Naciones.

La prueba se hace necesaria teniendo en cuenta que el imputado **LUIS ONOFRE REDONDO NIÑO** constituyó la empresa **GLOBAL NET USA CORP, con domicilio 39970 W EST FLAGLER ST.OFICINA 2003, MIAMI, FLORIDA 33134**. De acuerdo a los certificados de retención en la fuente que obran en las diligencias, la cuenta del Banco Popular a nombre de GLOBALNET LTDA entre los años 2000 y 2001 registra un rubro aproximado de  **$746.000.000**.oo por compra y venta de divisas.

## FUNDAMENTOS DE DERECHO

EN NUESTRO ORDENAMIENTO PENAL EL **DELITO DE LAVADO DE ACTIVOS**, SE ENCUETRA TIPIFICADO EN EL ARTÍCULO 323 *"EL QUE ADQUIERA, RESGUARDE, INVIERTA, TRANSPORTE, TRANSFORME, CUSTODIE O ADMINISTRE BIENES QUE TENGAN SU ORIGEN MEDIATO O INMEDIATO EN ACTIVIDADES DE TRÁFICO DE MIGRANTES, TRATA DE PERSONAS, EXTORSION, ENRIQUECIMIENTO ILICITO, SECUESTRO EXTORSIVO, REBELION, TRAFICO DE ARMAS, DELITOS CONTRA EL SISTEMA FINANCIERO, LA ADMINISTRACIÓN PUBLICA, O VINCULADOS CON EL PRODUCTO DE LOS DELITOS OBJETO DE UN CONCIERTO PARA DELINQUIR, RELACIONADAS CON EL TRAFICO DE DROGAS  TOXICAS, ESTUPEFACIENTES O SUSTANCIAS SICOTROPICAS0, O LES DE A LOS BIENES PROVENIENTES DE DICHAS ACTIVIDADES APARIENCIA DE LEGALIDAD O LOS LEGALICE, OCULTE O ENCUBRA LA VERDADERA NATURALEZA, ORIGEN, UBICACIÓN, DESTINO, MOVIMIENTO O DERECHOS SOBRE TALES BIENES, O REALICE CUALQUIER OTRO ACTO  PARA OCULTAR O ENCUBRIR SU ORIGEN  ILICITO INCURRIRA, POR ESA SOLA CONDUCTA, EN PRISION DE SEIS (6) A QUINCE (15) AÑOS  Y MULTA DE QUINIENTOS (500) A CINCUENTA MIL (50.000) SALARIOS MINIMOS LEGALES MENSUALES VIGENTES".*

UNA VEZ EVACUADAS LAS DILIGENCIAS CONFORME A SU LEY NACIONAL, SE SIRVA DEVOLVER LO ACTUADO POR LA VIA DIPLOMATICA.

**SEA LA OPORTUNIDAD PARA OFRECER RECIPROCIDAD EN LOS CASOS SIMILARES CONFORME A LA LEY COLOMBIANA, A LOS TRATADOS, COSTUMBRES INTERNACIONALES Y MANIFESTARLES NUESTRO AGRADECIMIENTO.**

**DE CONFORMIDAD AL ARTÍCULO 250 DE LA CONSTITUCION POLITICA DE COLOMBIA EN CONCORDANCIA CON EL ARTÍCULO 114 DEL CODIGO DE PROCEDIMIENTO PENAL LE CORRESPONDE A LA FISCALIA GENERAL DE LA NACION, INVESTIGAR LOS DELITOS Y ACUSAR A LOS PRESUNTOS INFRACTORES ANTE LOS JUZGADOS Y TRIBUNALES COMPETENTES.**

LA FISCAL ESPECIAL OCTAVA DELEGADA., ADSCRITA A LA UNIDAD NACIONAL PARA LA EXTINCION DEL DERECHO DE DOMINIO Y CONTRA EL LAVADO DE ACTIVOS DE BOGOTA D.C., VEINTIOCHO (28) DIAS DEL MES DE ABRIL DE DOS MIL CUATRO (2004).

**LUZ STELLA GIRALDO CARDONA
FISCAL OCTAVA DELEGADA**

La anterior Carta Rogatoria fue legitimamente elaborada por la Fiscal Especial Octava Delegada, adscrita a esta Unidad, con destino a la radicación **2085 L.A.**

---------------------------------------------

**MARIA CRISTINA CHIROLLA LOSADA
FISCAL JEFE DE UNIDAD**

## UNITED NATIONS CONVENTION AGAINST ILLICIT TRAFFIC IN
## NARCOTIC DRUGS AND PSYCHOTROPIC SUBSTANCES

Adopted by the Conference at its 6th plenary meeting,
on 19 December 1988

The Parties to this Convention,

*Deeply concerned* by the magnitude of and rising trend in the illicit production of, demand for and traffic in narcotic drugs and psychotropic substances, which pose a serious threat to the health and welfare of human beings and adversely affect the economic, cultural and political foundations of society,

*Deeply concerned also* by the steadily increasing inroads into various social groups made by illicit traffic in narcotic drugs and psychotropic substances, and particularly by the fact that children are used in many parts of the world as an illicit drug consumers market and for purposes of illicit production, distribution and trade in narcotic drugs and psychotropic substances, which entails a danger of incalculable gravity,

*Recognizing* the links between illicit traffic and other related organized criminal activities which undermine the legitimate economies and threaten the stability, security and sovereignty of States,

*Recognizing also* that illicit traffic is an international criminal activity, the suppression of which demands urgent attention and the highest priority,

*Aware* that illicit traffic generates large financial profits and wealth enabling transnational criminal organizations to penetrate, contaminate and corrupt the structures of government, legitimate commercial and financial business, and society at all its levels,

*Determined* to deprive persons engaged in illicit traffic of the proceeds of their criminal activities and thereby eliminate their main incentive for so doing,

*Desiring* to eliminate the root causes of the problem of abuse of narcotic drugs and psychotropic substances, including the illicit demand for such drugs and substances and the enormous profits derived from illicit traffic,

*Considering* that measures are necessary to monitor certain substances, including precursors, chemicals and solvents, which are used in the manufacture of narcotic drugs and psychotropic substances, the ready availability of which has led to an increase in the clandestine manufacture of such drugs and substances,

*Determined* to improve international co-operation in the suppression of illicit traffic by sea,

*Recognizing* that eradication of illicit traffic is a collective responsibility of all States and that, to that end, co-ordinated action within the framework of international co-operation is necessary,

*Acknowledging* the competence of the United Nations in the field of control of narcotic drugs and psychotropic substances and desirous that the international organs concerned with such control should be within the framework of that Organization,

*Reaffirming* the guiding principles of existing treaties in the field of narcotic drugs and psychotropic substances and the system of control which they embody,

*Recognizing* the need to reinforce and supplement the measures provided in the Single Convention on

Narcotic Drugs, 1961, that Convention as amended by the 1972 Protocol Amending the Single Convention on Narcotic Drugs, 1961, and the 1971 Convention on Psychotropic Substances, in order to counter the magnitude and extent of illicit traffic and its grave consequences,

*Recognizing also* the importance of strengthening and enhancing effective legal means for international co-operation in criminal matters for suppressing the international criminal activities of illicit traffic,

*Desiring* to conclude a comprehensive, effective and operative international convention that is directed specifically against illicit traffic and that considers the various aspects of the problem as a whole, in particular those aspects not envisaged in the existing treaties in the field of narcotic drugs and psychotropic substances,

Hereby agree as follows:

## *Article 1*

### DEFINITIONS

Except where otherwise expressly indicated or where the context otherwise requires, the following definitions shall apply throughout this Convention:

(a) "Board" means the International Narcotics Control Board established by the Single Convention on Narcotic Drugs, 1961, and that Convention as amended by the 1972 Protocol Amending the Single Convention on Narcotic Drugs, 1961;

(b) "Cannabis plant" means any plant of the genus Cannabis;

(c) "Coca bush" means the plant of any species of the genus Erythroxylon;

(d) "Commercial carrier" means any person or any public, private or other entity engaged in transporting persons, goods or mails for remuneration, hire or any other benefit;

(e) "Commission" means the Commission on Narcotic Drugs of the Economic and Social Council of the United nations;

(f) "Confiscation", which includes forfeiture where applicable, means the permanent deprivation of property by order of a court or other competent authority;

(g) "Controlled delivery" means the technique of allowing illicit or suspect consignments of narcotic drugs, psychotropic substances, substances in Table I and Table II annexed to this Convention, or substances substituted for them, to pass out of, through or into the territory of one or more countries, with the knowledge and under the supervision of their competent authorities, with a view to identifying persons involved in the commission of offences established in accordance with article 3, paragraph 1 of the Convention;

(h) "1961 Convention" means the Single Convention on Narcotic Drugs, 1961;

(i) "1961 Convention as amended" means the Single Convention on Narcotic Drugs, 1961, as amended by the 1972 Protocol Amending the Single Convention on Narcotic Drugs, 1961;

(j) "1971 Convention" means the Convention on Psychotropic Substances, 1971;

(k) "Council" means the Economic and Social Council of the United Nations;

(l) "Freezing" or "seizure" means temporarily prohibiting the transfer, conversion, disposition or movement of property or temporarily assuming custody or control of property on the basis of an order issued by a court or a competent authority;

(m) "Illicit traffic" means the offences set forth in article 3, paragraphs 1 and 2, of this Convention;

(n) "Narcotic drug" means any of the substances, natural or synthetic, in Schedules I and II of the Single Convention on Narcotic Drugs, 1961, and that Convention as amended by the 1972 Protocol Amending the Single Convention on Narcotic Drugs, 1961;

(o) "Opium poppy" means the plant of the species *Papaver somniferum* L;

(p) "Proceeds" means any property derived from or obtained, directly or indirectly, through the commission of an offence established in accordance with article 3, paragraph 1;

(q) "Property" means assets of every kind, whether corporeal or incorporeal, movable or immovable, tangible or intangible, and legal documents or instruments evidencing title to, or interest in, such assets;

(r) "Psychotropic substance" means any substance, natural or synthetic, or any natural material in Schedules I, II, III and IV of the Convention on Psychotropic Substances, 1971;

(s) "Secretary-General" means the Secretary-General of the United Nations;

(t) "Table I" and "Table II" mean the correspondingly numbered lists of substances annexed to this Convention, as amended from time to time in accordance with article 12;

(u) "Transit State" means a State through the territory of which illicit narcotic drugs, psychotropic substances and substances in Table I and Table II are being moved, which is neither the place of origin nor the place of ultimate destination thereof.

## *Article 2*

### SCOPE OF THE CONVENTION

1. The purpose of this Convention is to promote co-operation among the Parties so that they may address more effectively the various aspects of illicit traffic in narcotic drugs and psychotropic substances having an international dimension. In carrying out their obligations under the Convention, the Parties shall take necessary measures, including legislative and administrative measures, in conformity with the fundamental provisions of their respective domestic legislative systems.

2. The Parties shall carry out their obligations under this Convention in a manner consistent with the principles of sovereign equality and territorial integrity of States and that of non-intervention in the domestic affairs of other States.

3. A Party shall not undertake in the territory of another Party the exercise of jurisdiction and performance of functions which are exclusively reserved for the authorities of that other Party by its domestic law.

## *Article 3*

### OFFENCES AND SANCTIONS

1. Each Party shall adopt such measures as may be necessary to establish as criminal offences under its domestic law, when committed intentionally:

(a)    (i) The production, manufacture, extraction, preparation, offering, offering for sale, distribution, sale, delivery on any terms whatsoever, brokerage, dispatch, dispatch in transit, transport, importation or exportation of any narcotic drug or any psychotropic substance contrary to the provisions of the 1961 Convention, the 1961 Convention as amended or the 1971 Convention;

(ii) The cultivation of opium poppy, coca bush or cannabis plant for the purpose of the production of narcotic drugs contrary to the provisions of the 1961 Convention and the 1961 Convention as amended;

(iii) The possession or purchase of any narcotic drug or psychotropic substance for the purpose of any of the activities enumerated in (i) above;

(iv) The manufacture, transport or distribution of equipment, materials or of substances listed in Table I and Table II, knowing that they are to be used in or for the illicit cultivation, production or manufacture of narcotic drugs or psychotropic substances;

(v) The organization, management or financing of any of the offences enumerated in (i), (ii), (iii) or (iv) above;

(b)    (i) The conversion or transfer of property, knowing that such property is derived from any offence or offences established in accordance with subparagraph (a) of this paragraph, or from an act of participation in such offence or offences, for the purpose of concealing or disguising the illicit origin of the property or of assisting any person who is involved in the commission of such an offence or offences to evade the legal consequences of his actions;

(ii) The concealment or disguise of the true nature, source, location, disposition, movement, rights with respect to, or ownership of property, knowing that such property is derived from an offence or offences established in accordance with subparagraph (a) of this paragraph or from an act of participation in such an offence or offences;

(c) Subject to its constitutional principles and the basic concepts of its legal system:

(i) The acquisition, possession or use of property, knowing, at the time of receipt, that such property was derived from an offence or offences established in accordance with subparagraph (a) of this paragraph or from an act of participation in such offence or offences;

(ii) The possession of equipment or materials or substances listed in Table I and Table II, knowing that they are being or are to be used in or for the illicit cultivation, production or manufacture of narcotic drugs or psychotropic substances;

(iii) Publicly inciting or inducing others, by any means, to commit any of the offences established in accordance with this article or to use narcotic drugs or psychotropic substances illicitly;

(iv) Participation in, association or conspiracy to commit, attempts to commit and aiding, abetting, facilitating and counselling the commission of any of the offences established in accordance with this

article.

2. Subject to its constitutional principles and the basic concepts of its legal system, each Party shall adopt such measures as may be necessary to establish as a criminal offence under its domestic law, when committed intentionally, the possession, purchase or cultivation of narcotic drugs or psychotropic substances for personal consumption contrary to the provisions of the 1961 Convention, the 1961 Convention as amended or the 1971 Convention.

3. Knowledge, intent or purpose required as an element of an offence set forth in paragraph 1 of this article may be inferred from objective factual circumstances.

4.     (a) Each Party shall make the commission of the offences established in accordance with paragraph 1 of this article liable to sanctions which take into account the grave nature of these offences, such as imprisonment or other forms of deprivation of liberty, pecuniary sanctions and confiscation.

(b) The Parties may provide, in addition to conviction or punishment, for an offence established in accordance with paragraph 1 of this article, that the offender shall undergo measures such as treatment, education, aftercare, rehabilitation or social reintegration.

(c) Notwithstanding the preceding subparagraphs, in appropriate cases of a minor nature, the Parties may provide, as alternatives to conviction or punishment, measures such as education, rehabilitation or social reintegration, as well as, when the offender is a drug abuser, treatment and aftercare.

(d) The Parties may provide, either as an alternative to conviction or punishment, or in addition to conviction or punishment of an offence established in accordance with paragraph 2 of this article, measures for the treatment, education, aftercare, rehabilitation or social reintegration of the offender.

5. The Parties shall ensure that their courts and other competent authorities having jurisdiction can take into account factual circumstances which make the commission of the offences established in accordance with paragraph 1 of this article particularly serious, such as:

(a) The involvement in the offence of an organized criminal group to which the offender belongs;

(b) The involvement of the offender in other international organized criminal activities;

(c) The involvement of the offender in other illegal activities facilitated by commission of the offence;

(d) The use of violence or arms by the offender;

(e) The fact that the offender holds a public office and that the offence is connected with the office in question;

(f) The victimization or use of minors;

(g) The fact that the offence is committed in a penal institution or in an educational institution or social service facility or in their immediate vicinity or in other places to which school children and students resort for educational, sports and social activities;

(h) Prior conviction, particularly for similar offences, whether foreign or domestic, to the extent permitted under the domestic law of a Party.

6. The Parties shall endeavour to ensure that any discretionary legal powers under their domestic law

relating to the prosecution of persons for offences established in accordance with this article are exercised to maximize the effectiveness of law enforcement measures in respect of those offences and with due regard to the need to deter the commission of such offences.

7. The Parties shall ensure that their courts or other competent authorities bear in mind the serious nature of the offences enumerated in paragraph 1 of this article and the circumstances enumerated in paragraph 5 of this article when considering the eventuality of early release or parole of persons convicted of such offences.

8. Each Party shall, where appropriate, establish under its domestic law a long statute of limitations period in which to commence proceedings for any offence established in accordance with paragraph 1 of this article, and a longer period where the alleged offender has evaded the administration of justice.

9. Each Party shall take appropriate measures, consistent with its legal system, to ensure that a person charged with or convicted of an offence established in accordance with paragraph 1 of this article, who is found within its territory, is present at the necessary criminal proceedings.

10. For the purpose of co-operation among the Parties under this Convention, including, in particular, co-operation under articles 5, 6, 7 and 9, offences established in accordance with this article shall not be considered as fiscal offences or as political offences or regarded as politically motivated, without prejudice to the constitutional limitations and the fundamental domestic law of the Parties.

11. Nothing contained in this article shall affect the principle that the description of the offences to which it refers and of legal defences thereto is reserved to the domestic law of a Party and that such offences shall be prosecuted and punished in conformity with that law.

## *Article 4*

### JURISDICTION

1. Each Party:

(a) Shall take such measures as may be necessary to establish its jurisdiction over the offences it has established in accordance with article 3, paragraph 1, when:

(i) The offence is committed in its territory;

(ii) The offence is committed on board a vessel flying its flag or an aircraft which is registered under its laws at the time the offence is committed;

(b) May take such measures as may be necessary to establish its jurisdiction over the offences it has established in accordance with article 3, paragraph 1, when:

(i) The offence is committed by one of its nationals or by a person who has his habitual residence in its territory;

(ii) The offence is committed on board a vessel concerning which that Party has been authorized to take appropriate action pursuant to article 17, provided that such jurisdiction shall be exercised only on the basis of agreements or arrangements referred to in paragraphs 4 and 9 of that article;

(iii) The offence is one of those established in accordance with article 3, paragraph 1, subparagraph

(c)(iv), and is committed outside its territory with a view to the commission, within its territory, of an offence established in accordance with article 3, paragraph 1.

2. Each Party:

(a) Shall also take such measures as may be necessary to establish its jurisdiction over the offences it has established in accordance with article 3, paragraph 1, when the alleged offender is present in its territory and it does not extradite him to another Party on the ground:

(i) That the offence has been committed in its territory or on board a vessel flying its flag or an aircraft which was registered under its law at the time the offence was committed; or

(ii) That the offence has been committed by one of its nationals;

(b) May also take such measures as may be necessary to establish its jurisdiction over the offences it has established in accordance with article 3, paragraph 1, when the alleged offender is present in its territory and it does not extradite him to another Party.

3. This Convention does not exclude the exercise of any criminal jurisdiction established by a Party in accordance with its domestic law.

## *Article 5*

### CONFISCATION

1. Each Party shall adopt such measures as may be necessary to enable confiscation of:

(a) Proceeds derived from offences established in accordance with article 3, paragraph 1, or property the value of which corresponds to that of such proceeds;

(b) Narcotic drugs and psychotropic substances, materials and equipment or other instrumentalities used in or intended for use in any manner in offences established in accordance with article 3, paragraph 1.

2. Each Party shall also adopt such measures as may be necessary to enable its competent authorities to identify, trace, and freeze or seize proceeds, property, instrumentalities or any other things referred to in paragraph 1 of this article, for the purpose of eventual confiscation.

3. In order to carry out the measures referred to in this article, each Party shall empower its courts or other competent authorities to order that bank, financial or commercial records be made available or be seized. A Party shall not decline to act under the provisions of this paragraph on the ground of bank secrecy.

4.   (a) Following a request made pursuant to this article by another Party having jurisdiction over an offence established in accordance with article 3, paragraph 1, the Party in whose territory proceeds, property, instrumentalities or any other things referred to in paragraph 1 of this article are situated shall:

(i) Submit the request to its competent authorities for the purpose of obtaining an order of confiscation and, if such order is granted, give effect to it; or

(ii) Submit to its competent authorities, with a view to giving effect to it to the extent requested, an order of confiscation issued by the requesting Party in accordance with paragraph I of this article, in so far as it relates to proceeds, property, instrumentalities or any other things referred to in paragraph I situated in the

territory of the requested Party.

(b) Following a request made pursuant to this article by another Party having jurisdiction over an offence established in accordance with article 3, paragraph I, the requested Party shall take measures to identify, trace, and freeze or seize proceeds, property, instrumentalities or any other things referred to in paragraph I of this article for the purpose of eventual confiscation to be ordered either by the requesting Party or, pursuant to a request under subparagraph (a) of this paragraph, by the requested Party.

(c) The decisions or actions provided for in subparagraphs (a) and (b) of this paragraph shall be taken by the requested Party, in accordance with and subject to the provisions of its domestic law and its procedural rules or any bilateral or multilateral treaty, agreement or arrangement to which it may be bound in relation to the requesting Party.

(d) The provisions of article 7, paragraphs 6 to 19 are applicable *mutatis mutandis*. In addition to the information specified in article 7, paragraph 10, requests made pursuant to this article shall contain the following:

(i) In the case of a request pertaining to subparagraph (a)(i) of this paragraph, a description of the property to be confiscated and a statement of the facts relied upon by the requesting Party sufficient to enable the requested Party to seek the order under its domestic law;

(ii) In the case of a request pertaining to subparagraph (a)(ii), a legally admissible copy of an order of confiscation issued by the requesting Party upon which the request is based, a statement of the facts and information as to the extent to which the execution of the order is requested;

(iii) In the case of a request pertaining to subparagraph (b), a statement of the facts relied upon by the requesting Party and a description of the actions requested.

(e) Each Party shall furnish to the Secretary-General the text of any of its laws and regulations which give effect to this paragraph and the text of any subsequent changes to such laws and regulations.

(f) If a Party elects to make the taking of the measures referred to in subparagraphs (a) and (b) of this paragraph conditional on the existence of a relevant treaty, that Party shall consider this Convention as the necessary and sufficient treaty basis.

(g) The Parties shall seek to conclude bilateral and multilateral treaties, agreements or arrangements to enhance the effectiveness of international co-operation pursuant to this article.

5.    (a) Proceeds or property confiscated by a Party pursuant to paragraph 1 or paragraph 4 of this article shall be disposed of by that Party according to its domestic law and administrative procedures.

(b) When acting on the request of another Party in accordance with this article, a Party may give special consideration to concluding agreements on:

(i) Contributing the value of such proceeds and property, or funds derived from the sale of such proceeds or property, or a substantial part thereof, to intergovernmental bodies specializing in the fight against illicit traffic in and abuse of narcotic drugs and psychotropic substances;

(ii) Sharing with other Parties, on a regular or case-by-case basis, such proceeds or property, or funds derived from the sale of such proceeds or property, in accordance with its domestic law, administrative procedures or bilateral or multilateral agreements entered into for this purpose.

6.    (a) If proceeds have been transformed or converted into other property, such property shall be liable

to the measures referred to in this article instead of the proceeds.

(b) If proceeds have been intermingled with property acquired from legitimate sources, such property shall, without prejudice to any powers relating to seizure or freezing, be liable to confiscation up to the assessed value of the intermingled proceeds.

(c) Income or other benefits derived from:

(i) Proceeds;
(ii) Property into which proceeds have been transformed or converted; or
(iii) Property with which proceeds have been intermingled

shall also be liable to the measures referred to in this article, in the same manner and to the same extent as proceeds.

7. Each Party may consider ensuring that the onus of proof be reversed regarding the lawful origin of alleged proceeds or other property liable to confiscation, to the extent that such action is consistent with the principles of its domestic law and with the nature of the judicial and other proceedings.

8. The provisions of this article shall not be construed as prejudicing the rights of *bona fide* third parties.

9. Nothing contained in this article shall affect the principle that the measures to which it refers shall be defined and implemented in accordance with and subject to the provisions of the domestic law of a Party.

## *Article 6*

### EXTRADITION

1. This article shall apply to the offences established by the Parties in accordance with article 3, paragraph 1.

2. Each of the offences to which this article applies shall be deemed to be included as an extraditable offence in any extradition treaty existing between Parties. The Parties undertake to include such offences as extraditable offences in every extradition treaty to be concluded between them.

3. If a Party which makes extradition conditional on the existence of a treaty receives a request for extradition from another Party with which it has no extradition treaty, it may consider this Convention as the legal basis for extradition in respect of any offence to which this article applies. The Parties which require detailed legislation in order to use this Convention as a legal basis for extradition shall consider enacting such legislation as may be necessary.

4. The Parties which do not make extradition conditional on the existence of a treaty shall recognize offences to which this article applies as extraditable offences between themselves.

5. Extradition shall be subject to the conditions provided for by the law of the requested Party or by applicable extradition treaties, including the grounds upon which the requested Party may refuse extradition.

6. In considering requests received pursuant to this article, the requested State may refuse to comply with such requests where there are substantial grounds leading its judicial or other competent authorities to believe that compliance would facilitate the prosecution or punishment of any person on account of his

race, religion, nationality or political opinions, or would cause prejudice for any of those reasons to any person affected by the request.

7. The Parties shall endeavour to expedite extradition procedures and to simplify evidentiary requirements relating thereto in respect of any offence to which this article applies.

8. Subject to the provisions of its domestic law and its extradition treaties, the requested Party may, upon being satisfied that the circumstances so warrant and are urgent, and at the request of the requesting Party, take a person whose extradition is sought and who is present in its territory into custody or take other appropriate measures to ensure his presence at extradition proceedings.

9. Without prejudice to the exercise of any criminal jurisdiction established in accordance with its domestic law, a Party in whose territory an alleged offender is found shall:

(a) If it does not extradite him in respect of an offence established in accordance with article 3, paragraph 1, on the grounds set forth in article 4, paragraph 2, subparagraph (a), submit the case to its competent authorities for the purpose of prosecution, unless otherwise agreed with the requesting Party;

(b) If it does not extradite him in respect of such an offence and has established its jurisdiction in relation to that offence in accordance with article 4, paragraph 2, subparagraph (b), submit the case to its competent authorities for the purpose of prosecution, unless otherwise requested by the requesting Party for the purposes of preserving its legitimate jurisdiction.

10. If extradition, sought for purposes of enforcing a sentence, is refused because the person sought is a national of the requested Party, the requested Party shall, if its law so permits and in conformity with the requirements of such law, upon application of the requesting Party, consider the enforcement of the sentence which has been imposed under the law of the requesting Party, or the remainder thereof.

11. The Parties shall seek to conclude bilateral and multilateral agreements to carry out or to enhance the effectiveness of extradition.

12. The Parties may consider entering into bilateral or multilateral agreements, whether *ad hoc* or general, on the transfer to their country of persons sentenced to imprisonment and other forms of deprivation of liberty for offences to which this article applies, in order that they may complete their sentences there.

---

## Article 7

### MUTUAL LEGAL ASSISTANCE

1. The Parties shall afford one another, pursuant to this article, the widest measure of mutual legal assistance in investigations, prosecutions and judicial proceedings in relation to criminal offences established in accordance with article 3, paragraph 1.

2. Mutual legal assistance to be afforded in accordance with this article may be requested for any of the following purposes:

(a) Taking evidence or statements from persons;

(b) Effecting service of judicial documents;

(c) Executing searches and seizures;

(d) Examining objects and sites;

(e) Providing information and evidentiary items;

(f) Providing originals or certified copies of relevant documents and records, including bank, financial, corporate or business records;

(g) Identifying or tracing proceeds, property, instrumentalities or other things for evidentiary purposes.

3. The Parties may afford one another any other forms of mutual legal assistance allowed by the domestic law of the requested Party.

4. Upon request, the Parties shall facilitate or encourage, to the extent consistent wit their domestic law and practice, the presence or availability of persons, including persons in custody, who consent to assist in investigations or participate in proceedings.

5. A Party shall not decline to render mutual legal assistance under this article on the ground of bank secrecy.

6. The provisions of this article shall not affect the obligations under any other treaty, bilateral or multilateral, which governs or will govern, in whole or in part, mutual legal assistance in criminal matters.

7. Paragraphs 8 to 19 of this article shall apply to requests made pursuant to this article if the Parties in question are not bound by a treaty of mutual legal assistance. If these Parties are bound by such a treaty, the corresponding provisions of that treaty shall apply unless the Parties agree to apply paragraphs 8 to 19 of this article in lieu thereof.

8. Parties shall designate an authority, or when necessary authorities, which shall have the responsibility and power to execute requests for mutual legal assistance or to transmit them to the competent authorities for execution. The authority or the authorities designated for this purpose shall be notified to the Secretary-General. Transmission of requests for mutual legal assistance and any communication related thereto shall be effected between the authorities designated by the Parties; this requirement shall be without prejudice to the right of a Party to require that such requests and communications be addressed to it through the diplomatic channel and, in urgent circumstances, where the Parties agree, through channels of the International Criminal Police Organization, if possible.

9. Requests shall be made in writing in a language acceptable to the requested Party. The language or languages acceptable to each Party shall be notified to the Secretary-General. In urgent circumstances, and where agreed by the Parties, requests may be made orally, but shall be confirmed in writing forthwith.

10. A request for mutual legal assistance shall contain:

(a) The identity of the authority making the request;

(b) The subject matter and nature of the investigation, prosecution or proceeding to which the request relates, and the name and the functions of the authority conducting such investigation, prosecution or proceeding;

(c) A summary of the relevant facts, except in respect of requests for the purpose of service of judicial documents;

(d) A description of the assistance sought and details of any particular procedure the requesting Party wishes to be followed;

(e) Where possible, the identity, location and nationality of any person concerned;

(f) The purpose for which the evidence, information or action is sought.

11. The requested Party may request additional information when it appears necessary for the execution of the request in accordance with its domestic law or when it can facilitate such execution.

12. A request shall be executed in accordance with the domestic law of the requested Party and, to the extent not contrary to the domestic law of the requested Party and where possible, in accordance with the procedures specified in the request.

13. The requesting Party shall not transmit nor use information or evidence furnished by the requested Party for investigations, prosecutions or proceedings other than those stated in the request without the prior consent of the requested Party.

14. The requesting Party may require that the requested Party keep confidential the fact and substance of the request, except to the extent necessary to execute the request. If the requested Party cannot comply with the requirement of confidentiality, it shall promptly inform the requesting Party.

15. Mutual legal assistance may be refused:

(a) If the request is not made in conformity with the provisions of this article;

(b) If the requested Party considers that execution of the request is likely to prejudice its sovereignty, security, *ordure public* or other essential interests;

(c) If the authorities of the requested Party would be prohibited by its domestic law from carrying out the action requested with regard to any similar offence, had it been subject to investigation, prosecution or proceedings under their own jurisdiction;

(d) If it would be contrary to the legal system of the requested Party relating to mutual legal assistance for the request to be granted.

16. Reasons shall be given for any refusal of mutual legal assistance.

17. Mutual legal assistance may be postponed by the requested Party on the ground that it interferes with an ongoing investigation, prosecution or proceeding. In such a case, the requested Party shall consult with the requesting Party to determine if the assistance can still be given subject to such terms and conditions as the requested Party deems necessary.

18. A witness, expert or other person who consents to give evidence in a proceeding or to assist in an investigation, prosecution or judicial proceeding in the territory of the requesting Party, shall not be prosecuted, detained, punished or subjected to any other restriction of his personal liberty in that territory in respect of acts, omissions or convictions prior to his departure from the territory of the requested Party. Such safe conduct shall cease when the witness, expert or other person having had, for a period of fifteen consecutive days, or for any period agreed upon by the Parties, from the date on which he has been officially informed that his presence is no longer required by the judicial authorities, an opportunity of leaving, has nevertheless remained voluntarily in the territory or, having left it, has returned of his own free will.

19. The ordinary costs of executing a request shall be borne by the requested Party, unless otherwise agreed by the Parties concerned. If expenses of a substantial or extraordinary nature are or will be required to fulfil the request, the Parties shall consult to determine the terms and conditions under which the request will be executed as well as the manner in which the costs shall be borne.

20. The Parties shall consider, as may be necessary, the possibility of concluding bilateral or multilateral agreements or arrangements that would serve the purposes of, give practical effect to, or enhance the provisions of this article.

## Article 8

### TRANSFER OF PROCEEDINGS

The Parties shall give consideration to the possibility of transferring to one another proceedings for criminal prosecution of offences established in accordance with article 3, paragraph 1, in cases where such transfer is considered to be in the interests of a proper administration of justice.

## Article 9

### OTHER FORMS OF CO-OPERATION AND TRAINING

1. The Parties shall co-operate closely with one another, consistent with their respective domestic legal and administrative systems, with a view to enhancing the effectiveness of law enforcement action to suppress the commission of offences established in accordance with article 3, paragraph 1. They shall, in particular, on the basis of bilateral or multilateral agreements or arrangements:

(a) Establish and maintain channels of communication between their competent agencies and services to facilitate the secure and rapid exchange of information concerning all aspects of offences established in accordance with article 3, paragraph 1, including, if the Parties concerned deem it appropriate, links with other criminal activities;

(b) Co-operate with one another in conducting enquiries, with respect to offences established in accordance with article 3, paragraph 1, having an international character, concerning:

(i) The identity, whereabouts and activities of persons suspected of being involved in offences established in accordance with article 3, paragraph 1;

(ii) The movement of proceeds or property derived from the commission of such offences;

(iii) The movement of narcotic drugs, psychotropic substances, substances in Table I and Table II of this Convention and instrumentalities used or intended for use in the commission of such offences;

(c) In appropriate cases and if not contrary to domestic law, establish joint teams, taking into account the need to protect the security of persons and of operations, to carry out the provisions of this paragraph. Officials of any Party taking part in such teams shall act as authorized by the appropriate authorities of the Party in whose territory the operation is to take place; in all such cases, the Parties involved shall ensure that the sovereignty of the Party on whose territory the operation is to take place is fully respected;

(d) Provide, when appropriate, necessary quantities of substances for analytical or investigative purposes;

(e) Facilitate effective co-ordination between their competent agencies and services and promote the exchange of personnel and other experts, including the posting of liaison officers.

2. Each Party shall, to the extent necessary, initiate, develop or improve specific training programmes for its law enforcement and other personnel, including customs, charged with the suppression of offences established in accordance with article 3, paragraph 1. Such programmes shall deal, in particular, with the following:

(a) Methods used in the detection and suppression of offences established in accordance with article 3, paragraph 1;

(b) Routes and techniques used by persons suspected of being involved in offences established in accordance with article 3, paragraph 1, particularly in transit States, and appropriate countermeasures;

(c) Monitoring of the import and export of narcotic drugs, psychotropic substances and substances in Table I and Table II;

(d) Detection and monitoring of the movement of proceeds and property derived from, and narcotic drugs, psychotropic substances and substances in Table I and Table II, and instrumentalities used or intended for use in, the commission of offences established in accordance with article 3, paragraph 1;

(e) Methods used for the transfer, concealment or disguise of such proceeds, property and instrumentalities;

(f) Collection of evidence;

(g) Control techniques in free trade zones and free ports;

(h) Modern law enforcement techniques.

3. The Parties shall assist one another to plan and implement research and training programmes designed to share expertise in the areas referred to in paragraph 2 of this article and, to this end, shall also, when appropriate, use regional and international conferences and seminars to promote co-operation and stimulate discussion on problems of mutual concern, including the special problems and needs of transit States.

## Article 10

### INTERNATIONAL CO-OPERATION AND ASSISTANCE FOR TRANSIT STATES

1. The Parties shall co-operate, directly or through competent international or regional organizations, to assist and support transit States and, in particular, developing countries in need of such assistance and support, to the extent possible, through programmes of technical co-operation on interdiction and other related activities.

2. The Parties may undertake, directly or through competent international or regional organizations, to provide financial assistance to such transit States for the purpose of augmenting and strengthening the infrastructure needed for effective control and prevention of illicit traffic.

3. The Parties may conclude bilateral or multilateral agreements or arrangements to enhance the

effectiveness of international co-operation pursuant to this article and may take into consideration financial arrangements in this regard.

## *Article 11*

### CONTROLLED DELIVERY

1. If permitted by the basic principles of their respective domestic legal systems, the Parties shall take the necessary measures, within their possibilities, to allow for the appropriate use of controlled delivery at the international level, on the basis of agreements or arrangements mutually consented to, with a view to identifying persons involved in offences established in accordance with article 3, paragraph 1, and to taking legal action against them.

2. Decisions to use controlled delivery shall be made on a case-by-case basis and may, when necessary, take into consideration financial arrangements and understandings with respect to the exercise of jurisdiction by the Parties concerned.

3. Illicit consignments whose controlled delivery is agreed to may, with the consent of the Parties concerned, be intercepted and allowed to continue with the narcotic drugs or psychotropic substances intact or removed or replaced in whole or in part.

## *Article 12*

### SUBSTANCES FREQUENTLY USED IN THE ILLICIT
### MANUFACTURE OF NARCOTIC DRUGS OR PSYCHOTROPIC SUBSTANCES

1. The Parties shall take the measures they deem appropriate to prevent diversion of substances in Table I and Table II used for the purpose of illicit manufacture of narcotic drugs or psychotropic substances, and shall co-operate with one another to this end.

2. If a Party or the Board has information which in its opinion may require the inclusion of a substance in Table I or Table II, it shall notify the Secretary-General and furnish him with the information in support of that notification. The procedure described in paragraphs 2 to 7 of this article shall also apply when a Party or the Board has information justifying the deletion of a substance from Table I or Table II, or the transfer of a substance from one Table to the other.

3. The Secretary-General shall transmit such notification, and any information which he considers relevant, to the Parties, to the Commission, and, where notification is made by a Party, to the Board. The Parties shall communicate their comments concerning the notification to the Secretary-General, together with all supplementary information which may assist the Board in establishing an assessment and the Commission in reaching a decision.

4. If the Board, taking into account the extent, importance and diversity of the licit use of the substance, and the possibility and ease of using alternate substances both for licit purposes and for the illicit manufacture of narcotic drugs or psychotropic substances, finds:

(a) That the substance is frequently used in the illicit manufacture of a narcotic drug or psychotropic substance;

(b) That the volume and extent of the illicit manufacture of a narcotic drug or psychotropic substance

creates serious public health or social problems, so as to warrant international action, it shall communicate to the Commission an assessment of the substance, including the likely effect of adding the substance to either Table I or Table II on both licit use and illicit manufacture, together with recommendations of monitoring measures, if any, that would be appropriate in the light of its assessment.

5. The Commission, taking into account the comments submitted by the Parties and the comments and recommendations of the Board, whose assessment shall be determinative as to scientific matters, and also taking into due consideration any other relevant factors, may decide by a two-thirds majority of its members to place a substance in Table I or Table II.

6. Any decision of the Commission taken pursuant to this article shall be communicated by the Secretary-General to all States and other entities which are, or which are entitled to become, Parties to this Convention, and to the Board. Such decision shall become fully effective with respect to each Party one hundred and eighty days after the date of such communication.

7.    (a) The decisions of the Commission taken under this article shall be subject to review by the Council upon the request of any Party filed within one hundred and eighty days after the date of notification of the decision. The request for review shall be sent to the Secretary-General, together with all relevant information upon which the request for review is based.

(b) The Secretary-General shall transmit copies of the request for review and the relevant information to the Commission, to the Board and to all the Parties, inviting them to submit their comments within ninety days. All comments received shall be submitted to the Council for consideration.

(c) The Council may confirm or reverse the decision of the Commission. Notification of the Council's decision shall be transmitted to all States and other entities which are, or which are entitled to become, Parties to this Convention, to the Commission and to the Board.

8.    (a) Without prejudice to the generality of the provisions contained in paragraph 1 of this article and the provisions of the 1961 Convention, the 1961 Convention as amended and the 1971 Convention, the Parties shall take the measures they deem appropriate to monitor the manufacture and distribution of substances in Table I and Table II which are carried out within their territory.

(b) To this end, the Parties may:

(i) Control all persons and enterprises engaged in the manufacture and distribution of such substances;

(ii) Control under licence the establishment and premises in which such manufacture or distribution may take place;

(iii) Require that licensees obtain a permit for conducting the aforesaid operations

(iv) Prevent the accumulation of such substances in the possession of manufacturers and distributors, in excess of the quantities required for the normal conduct of business and the prevailing market conditions.

9. Each Party shall, with respect to substances in Table I and Table II, take the following measures:

(a) Establish and maintain a system to monitor international trade in substances in Table I and Table II in order to facilitate the identification of suspicious transactions. Such monitoring systems shall be applied in close co-operation with manufacturers, importers, exporters, wholesalers and retailers, who shall inform the competent authorities of suspicious orders and transactions.

(b) Provide for the seizure of any substance in Table I or Table II if there is sufficient evidence that it is for use in the illicit manufacture of a narcotic drug or psychotropic substance.

(c) Notify, as soon as possible, the competent authorities and services of the Parties concerned if there is reason to believe that the import, export or transit of a substance in Table I or Table II is destined for the illicit manufacture of narcotic drugs or psychotropic substances, including in particular information about the means of payment and any other essential elements which led to that belief.

(d) Require that imports and exports be properly labelled and documented. Commercial documents such as invoices, cargo manifests, customs, transport and other shipping documents shall include the names, as stated in Table I or Table II, of the substances being imported or exported, the quantity being imported or exported, and the name and address of the exporter, the importer and, when available, the consignee.

(e) Ensure that documents referred to in subparagraph (d) of this paragraph are maintained for a period of not less than two years and may be made available for inspection by the competent authorities.

10.   (a) In addition to the provisions of paragraph 9, and upon request to the Secretary-General by the interested Party, each Party from whose territory a substance in Table I is to be exported shall ensure that, prior to such export, the following information is supplied by its competent authorities of the competent authorities of the importing country:

(i) Name and address of the exporter and importer and, when available, the consignee;

(ii) Name of the substance in Table I;

(iii) Quantity of the substance to be exported;

(iv) Expected point of entry and expected date of dispatch;

(v) Any other information which is mutually agreed upon by the Parties.

(b) A Party may adopt more strict or severe measures of control than those provided by this paragraph if, in its opinion, such measures are desirable or necessary.

11. Where a Party furnishes information to another Party in accordance with paragraphs 9 and 10 of this article, the Party furnishing such information may require that the Party receiving it keep confidential any trade, business, commercial or professional secret or trade process.

12. Each Party shall furnish annually to the Board, in the form and manner provided for by it and on forms made available by it, information on:

(a) The amounts seized of substances in Table I and Table II and, when known, their origin;

(b) Any substance not included in Table I or Table II which is identified as having been used in illicit manufacture of narcotic drugs or psychotropic substances, and which is deemed by the Party to be sufficiently significant to be brought to the attention of the Board;

(c) Methods of diversion and illicit manufacture.

13. The Board shall report annually to the Commission on the implementation of this article and the

Commission shall periodically review the adequacy and propriety of Table I and Table II.

14. The provisions of this article shall not apply to pharmaceutical preparations, nor to other preparations containing substances in Table I or Table II that are compounded in such a way that such substances cannot be easily used or recovered by readily applicable means.

## Article 13

### MATERIALS AND EQUIPMENT

The Parties shall take such measures as they deem appropriate to prevent trade in and the diversion of materials and equipment for illicit production or manufacture of narcotic drugs and psychotropic substances and shall co-operate to this end.

## Article 14

### MEASURES TO ERADICATE ILLICIT CULTIVATION OF NARCOTIC PLANTS AND TO ELIMINATE ILLICIT DEMAND FOR NARCOTIC DRUGS AND PSYCHOTROPIC SUBSTANCES

1. Any measures taken pursuant to this Convention by Parties shall not be less stringent than the provisions applicable to the eradication of illicit cultivation of plants containing narcotic and psychotropic substances and to the elimination of illicit demand for narcotic drugs and psychotropic substances under the provisions of the 1961 Convention, the 1961 Convention as amended and the 1971 Convention.

2. Each Party shall take appropriate measures to prevent illicit cultivation of and to eradicate plants containing narcotic or psychotropic substances, such as opium poppy, coca bush and cannabis plants, cultivated illicitly in its territory. The measures adopted shall respect fundamental human rights and shall take due account of traditional licit uses, where there is historic evidence of such use, as well as the protection of the environment.

3. (a) The Parties may co-operate to increase the effectiveness of eradication efforts. Such co-operation may, *inter alia*, include support, when appropriate, for integrated rural development leading to economically viable alternatives to illicit cultivation. Factors such as access to markets, the availability of resources and prevailing socio-economic conditions should be taken into account before such rural development programmes are implemented. The Parties may agree on any other appropriate measures of co-operation.

(b) The Parties shall also facilitate the exchange of scientific and technical information and the conduct of research concerning eradication.

(c) Whenever they have common frontiers, the Parties shall seek to co-operate in eradication programmes in their respective areas along those frontiers.

4. The Parties shall adopt appropriate measures aimed at eliminating or reducing illicit demand for narcotic drugs and psychotropic substances, with a view to reducing human suffering and eliminating financial incentives for illicit traffic. These measures may be based, *inter alia*, on the recommendations of the United Nations, specialized agencies of the United Nations such as the World Health Organization, and other competent international organizations, and on the Comprehensive Multidisciplinary Outline adopted by the International Conference on Drug Abuse and Illicit Trafficking, held in 1987, as it pertains

to governmental and non-governmental agencies and private efforts in the fields of prevention, treatment and rehabilitation. The Parties may enter into bilateral or multilateral agreements or arrangements aimed at eliminating or reducing illicit demand for narcotic drugs and psychotropic substances.

5. The Parties may also take necessary measures for early destruction or lawful disposal of the narcotic drugs, psychotropic substances and substances in Table I and Table II which have been seized or confiscated and for the admissibility as evidence of duly certified necessary quantities of such substances.

## Article 15

### COMMERCIAL CARRIERS

1. The Parties shall take appropriate measures to ensure that means of transport operated by commercial carriers are not used in the commission of offences established in accordance with article 3, paragraph 1; such measures may include special arrangements with commercial carriers.

2. Each Party shall require commercial carriers to take reasonable precautions to prevent the use of their means of transport for the commission of offences established in accordance with article 3, paragraph 1. Such precautions may include:

(a) If the principal place of business of a commercial carrier is within the territory of the Party:

(i) Training of personnel to identify suspicious consignments or persons;

(ii) Promotion of integrity of personnel;

(b) If a commercial carrier is operating within the territory of the Party:

(i) Submission of cargo manifests in advance, whenever possible;

(ii) Use of tamper-resistant, individually verifiable seals on containers;

(iii) Reporting to the appropriate authorities at the earliest opportunity all suspicious circumstances that may be related to the commission of offences established in accordance with article 3, paragraph 1.

3. Each Party shall seek to ensure that commercial carriers and the appropriate authorities at points of entry and exit and other customs control areas co-operate, with a view to preventing unauthorized access to means of transport and cargo and to implementing appropriate security measures.

## Article 16

### COMMERCIAL DOCUMENTS AND LABELLING OF EXPORTS

1. Each Party shall require that lawful exports of narcotic drugs and psychotropic substances be properly documented. In addition to the requirements for documentation under article 31 of the 1961 Convention, article 31 of the 1961 Convention as amended and article 12 of the 1971 Convention, commercial documents such as invoices, cargo manifests, customs, transport and other shipping documents shall include the names of the narcotic drugs and psychotropic substances being exported as set out in the respective Schedules of the 1961 Convention, the 1961 Convention as amended and the 1971

Convention, the quantity being exported, and the name and address of the exporter, the importer and, when available, the consignee.

2. Each Party shall require that consignments of narcotic drugs and psychotropic substances being exported be not mislabelled.

## *Article 17*

### ILLICIT TRAFFIC BY SEA

1. The Parties shall co-operate to the fullest extent possible to suppress illicit traffic by sea, in conformity with the international law of the sea.

2. A Party which has reasonable grounds to suspect that a vessel flying its flag or not displaying a flag or marks of registry is engaged in illicit traffic may request the assistance of other Parties in suppressing its use for that purpose. The Parties so requested shall render such assistance within the means available to them.

3. A Party which has reasonable grounds to suspect that a vessel exercising freedom of navigation in accordance with international law and flying the flag or displaying marks of registry of another Party is engaged in illicit traffic may so notify the flag State, request confirmation of registry and, if confirmed, request authorization from the flag State to take appropriate measures in regard to that vessel.

4. In accordance with paragraph 3 or in accordance with treaties in force between them or in accordance with any agreement or arrangement otherwise reached between those Parties, the flag State may authorize the requesting State to, inter alia:

(a) Board the vessel;

(b) Search the vessel;

(c) If evidence of involvement in illicit traffic is found, take appropriate action with respect to the vessel, persons and cargo on board.

5. Where action is taken pursuant to this article, the Parties concerned shall take due account of the need not to endanger the safety of life at sea, the security of the vessel and the cargo or to prejudice the commercial and legal interests of the flag State or any other interested State.

6. The flag State may, consistent with its obligations in paragraph 1 of this article, subject its authorization to conditions to be mutually agreed between it and the requesting Party, including conditions relating to responsibility.

7. For the purposes of paragraphs 3 and 4 of this article, a Party shall respond expeditiously to a request from another Party to determine whether a vessel that is flying its flag is entitled to do so, and to requests for authorization made pursuant to paragraph 3. At the time of becoming a Party to this Convention, each Party shall designate an authority or, when necessary, authorities to receive and respond to such requests. Such designation shall be notified through the Secretary-General to all other Parties within one month of the designation.

8. A Party which has taken any action in accordance with this article shall promptly inform the flag State concerned of the results of that action.

9. The Parties shall consider entering into bilateral or regional agreements or arrangements to carry out, or to enhance the effectiveness of, the provisions of this article.

10. Action pursuant to paragraph 4 of this article shall be carried out only by warships or military aircraft, or other ships or aircraft clearly marked and identifiable as being on government service and authorized to that effect.

11. Any action taken in accordance with this article shall take due account of the need not to interfere with or affect the rights and obligations and the exercise of jurisdiction of coastal States in accordance with the international law of the sea.

## Article 18

### FREE TRADE ZONES AND FREE PORTS

1. The Parties shall apply measures to suppress illicit traffic in narcotic drugs, psychotropic substances and substances in Table I and Table II in free trade zones and in free ports that are no less stringent than those applied in other parts of their territories.

2. The Parties shall endeavour:

(a) To monitor the movement of goods and persons in free trade zones and free ports, and, to that end, shall empower the competent authorities to search cargoes and incoming and outgoing vessels, including pleasure craft and fishing vessels, as well as aircraft and vehicles and, when appropriate, to search crew members, passengers and their baggage;

(b) To establish and maintain a system to detect consignments suspected of containing narcotic drugs, psychotropic substances and substances in Table I and Table II passing into or out of free trade zones and free ports;

(c) To establish and maintain surveillance systems in harbour and dock areas and at airports and border control points in free trade zones and free ports.

## Article 19

### THE USE OF THE MAILS

1. In conformity with their obligations under the Conventions of the Universal Postal Union, and in accordance with the basic principles of their domestic legal systems, the Parties shall adopt measures to suppress the use of the mails for illicit traffic and shall co-operate with one another to that end.

2. The measures referred to in paragraph 1 of this article shall include, in particular:

(a) Co-ordinated action for the prevention and repression of the use of the mails for illicit traffic;

(b) Introduction and maintenance by authorized law enforcement personnel of investigative and control techniques designed to detect illicit consignments of narcotic drugs, psychotropic substances and substances in Table I and Table II in the mails;

(c) Legislative measures to enable the use of appropriate means to secure evidence required for judicial proceedings.

## *Article 20*

### INFORMATION TO BE FURNISHED BY THE PARTIES

1. The Parties shall furnish, through the Secretary-General, information to the Commission on the working of this Convention in their territories and, in particular:

(a) The text of laws and regulations promulgated in order to give effect to the Convention;

(b) Particulars of cases of illicit traffic within their jurisdiction which they consider important because of new trends disclosed, the quantities involved, the sources from which the substances are obtained, or the methods employed by persons so engaged.

2. The Parties shall furnish such information in such a manner and by such dates as the Commission may request.

## *Article 21*

### FUNCTIONS OF THE COMMISSION

The Commission is authorized to consider all matters pertaining to the aims of this Convention and, in particular:

(a) The Commission shall, on the basis of the information submitted by the Parties in accordance with article 20, review the operation of this Convention;

(b) The Commission may make suggestions and general recommendations based on the examination of the information received from the Parties;

(c) The Commission may call the attention of the Board to any matters which may be relevant to the functions of the Board;

(d) The Commission shall, on any matter referred to it by the Board under article 22, paragraph 1(b), take such action as it deems appropriate;

(e) The Commission may, in conformity with the procedures laid down in article 12, amend Table I and Table II;

(f) The Commission may draw the attention of non-Parties to decisions and recommendations which it adopts under this Convention, with a view to their considering taking action in accordance therewith.

## *Article 22*

## FUNCTIONS OF THE BOARD

1. Without prejudice to the functions of the Commission under article 21, and without prejudice to the functions of the Board and the Commission under the 1961 Convention, the 1961 Convention as amended and the 1971 Convention:

(a) If, on the basis of its examination of information available to it, to the Secretary-General or to the Commission, or of information communicated by United Nations organs, the Board has reason to believe that the aims of this Convention in matters related to its competence are not being met, the Board may invite a Party or Parties to furnish any relevant information;

(b) With respect to articles 12, 13 and 16:

(i) After taking action under subparagraph (a) of this article, the Board, if satisfied that it is necessary to do so, may call upon the Party concerned to adopt such remedial measures as shall seem under the circumstances to be necessary for the execution of the provisions of articles 12, 13 and 16;

(ii) Prior to taking action under (iii) below, the Board shall treat as confidential its communications with the Party concerned under the preceding subparagraphs;

(iii) If the Board finds that the Party concerned has not taken remedial measures which it has been called upon to take under this subparagraph, it may call the attention of the Parties, the Council and the Commission to the matter. Any report published by the Board under this subparagraph shall also contain the views of the Party concerned if the latter so requests.

2. Any Party shall be invited to be represented at a meeting of the Board at which a question of direct interest to it is to be considered under this article.

3. If in any case a decision of the Board which is adopted under this article is not unanimous, the views of the minority shall be stated.

4. Decisions of the Board under this article shall be taken by a two-thirds majority of the whole number of the Board.

5. In carrying out its functions pursuant to subparagraph 1(a) of this article, the Board shall ensure the confidentiality of all information which may come into its possession.

6. The Board's responsibility under this article shall not apply to the implementation of treaties or agreements entered into between Parties in accordance with the provisions of this Convention.

7. The provisions of this article shall not be applicable to disputes between Parties falling under the provisions of article 32.

## *Article 23*

## REPORTS OF THE BOARD

1. The Board shall prepare an annual report on its work containing an analysis of the information at its disposal and, in appropriate cases, an account of the explanations, if any, given by or required of Parties, together with any observations and recommendations which the Board desires to make. The Board may make such additional reports as it considers necessary. The reports shall be submitted to the Council

through the Commission which may make such comments as it sees fit.

2. The reports of the Board shall be communicated to the Parties and subsequently published by the Secretary-General. The Parties shall permit their unrestricted distribution.

## Article 24

### APPLICATION OF STRICTER MEASURES THAN
### THOSE REQUIRED BY THIS CONVENTION

A Party may adopt more strict or severe measures than those provided by this Convention if, in its opinion, such measures are desirable or necessary for the prevention or suppression of illicit traffic.

## Article 25

### NON-DEROGATION FROM EARLIER TREATY RIGHTS AND OBLIGATIONS

The provisions of this Convention shall not derogate from any rights enjoyed or obligations undertaken by Parties to this Convention under the 1961 Convention, the 1961 Convention as amended and the 1971 Convention.

## Article 26

### SIGNATURE

This Convention shall be open for signature at the United Nations Office at Vienna, from 20 December 1988 to 28 February 1989, and thereafter at the Headquarters of the United Nations at New York, until 20 December 1989, by:

(a) All States;

(b) Namibia, represented by the United Nations Council for Namibia;

(c) Regional economic integration organizations which have competence in respect of the negotiation, conclusion and application of international agreements in matters covered by this Convention, references under the Convention to Parties, States or national services being applicable to these organizations within the limits of their competence.

## Article 27

### RATIFICATION, ACCEPTANCE, APPROVAL OR ACT OF FORMAL CONFIRMATION

1. This Convention is subject to ratification, acceptance or approval by States and by Namibia, represented by the United Nations Council for Namibia, and to acts of formal confirmation by regional economic integration organizations referred to in article 26, subparagraph (c). The instruments of ratification, acceptance or approval and those relating to acts of formal confirmation shall be deposited

with the Secretary-General.

2. In their instruments of formal confirmation, regional economic integration organizations shall declare the extent of their competence with respect to the matters governed by this Convention. These organizations shall also inform the Secretary-General of any modification in the extent of their competence with respect to the matters governed by the Convention.

## Article 28

### ACCESSION

1. This Convention shall remain open for accession by any State, by Namibia, represented by the United Nations Council for Namibia, and by regional economic integration organizations referred to in article 26, subparagraph (c). Accession shall be effected by the deposit of an instrument of accession with the Secretary-General.

2. In their instruments of accession, regional economic integration organizations shall declare the extent of their competence with respect to the matters governed by this Convention. These organizations shall also inform the Secretary-General of any modification in the extent of their competence with respect to the matters governed by the Convention.

## Article 29

### ENTRY INTO FORCE

1. This Convention shall enter into force on the ninetieth day after the date of the deposit with the Secretary-General of the twentieth instrument of ratification, acceptance, approval or accession by States or by Namibia, represented by the Council for Namibia.

2. For each State or for Namibia, represented by the Council for Namibia, ratifying, accepting, approving or acceding to this Convention after the deposit of the twentieth instrument of ratification, acceptance, approval or accession, the Convention shall enter into force on the ninetieth day after the date of the deposit of its instrument of ratification, acceptance, approval or accession.

3. For each regional economic integration organization referred to in article 26, subparagraph (c) depositing an instrument relating to an act of formal confirmation or an instrument of accession, this Convention shall enter into force on the ninetieth day after such deposit, or at the date the Convention enters into force pursuant to paragraph 1 of this article, whichever is later.

## Article 30

### DENUNCIATION

1. A Party may denounce this Convention at any time by a written notification addressed to the Secretary-General.

2. Such denunciation shall take effect for the Party concerned one year after the date of receipt of the notification by the Secretary-General.

## *Article 31*

### AMENDMENTS

1. Any Party may propose an amendment to this Convention. The text of any such amendment and the reasons therefor shall be communicated by that Party to the Secretary-General, who shall communicate it to the other Parties and shall ask them whether they accept the proposed amendment. If a proposed amendment so circulated has not been rejected by any Party within twenty-four months after it has been circulated, it shall be deemed to have been accepted and shall enter into force in respect of a Party ninety days after that Party has deposited with the Secretary-General an instrument expressing its consent to be bound by that amendment.

2. If a proposed amendment has been rejected by any Party, the Secretary-General shall consult with the Parties and, if a majority so requests, he shall bring the matter, together with any comments made by the Parties, before the Council which may decide to call a conference in accordance with Article 62, paragraph 4, of the Charter of the United Nations. Any amendment resulting from such a conference shall be embodied in a Protocol of Amendment. Consent to be bound by such a Protocol shall be required to be expressed specifically to the Secretary-General.

## *Article 32*

### SETTLEMENT OF DISPUTES

1. If there should arise between two or more Parties a dispute relating to the interpretation or application of this Convention, the Parties shall consult together with a view to the settlement of the dispute by negotiation, enquiry, mediation, conciliation, arbitration, recourse to regional bodies, judicial process or other peaceful means of their own choice.

2. Any such dispute which cannot be settled in the manner prescribed in paragraph 1 of this article shall be referred, at the request of any one of the States Parties to the dispute, to the International Court of Justice for decision.

3. If a regional economic integration organization referred to in article 26, subparagraph (c) is a Party to a dispute which cannot be settled in the manner prescribed in paragraph 1 of this article, it may, through a State Member of the United Nations, request the Council to request an advisory opinion of the International Court of Justice in accordance with Article 65 of the Statute of the Court, which opinion shall be regarded as decisive.

4. Each State, at the time of signature or ratification, acceptance or approval of this Convention or accession thereto, or each regional economic integration organization, at the time of signature or deposit of an act of formal confirmation or accession, may declare that it does not consider itself bound by paragraphs 2 and 3 of this article. The other Parties shall not be bound by paragraphs 2 and 3 with respect to any Party having made such a declaration.

5. Any Party having made a declaration in accordance with paragraph 4 of this article may at any time withdraw the declaration by notification to the Secretary-General.

## *Article 33*

## AUTHENTIC TEXTS

The Arabic, Chinese, English, French, Russian and Spanish texts of this Convention are equally authentic.

## *Article 34*

### DEPOSITARY

The Secretary-General shall be the depositary of this Convention.

IN WITNESS WHEREOF the undersigned, being duly authorized thereto, have signed this Convention.

DONE AT VIENNA, in one original, this twentieth day of December one thousand nine hundred and eighty-eight.

Top